IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KELLY WINKLER, and, <br> CHARLES WINKLER, | : <br> : <br> : | CIV. ACTION NO. |
| Plaintiffs, | : <br> : | |
| v. | : <br> : | COMPLAINT |
| SYNAPSE MARKETING SOLUTIONS, <br> and SAXTON & STUMP, | : <br> : <br> : | |
| Defendants. | : <br> : <br> : | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs, Kelly Winkler and Charles Winkler, by and through their undersigned counsel, The Lacy Employment Law Firm LLC, hereby files this Complaint against Defendants and states as follows:

### PROCEDURAL AND ADMINISTRATIVE REMEDIES

1. All the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference as if set forth herein at length.

2. Venue is proper in the District Court under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred within this District.

3. On or about December 12, 2022, Plaintiffs dual-filed charges with the Philadelphia office of the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission alleging discrimination and retaliation on the basis of sex, age, and disability. *See* EEOC Charges of Discrimination, attached as Exhibit 1.

4. The EEOC issued Right to Sue letters ("Right to Sue") and Plaintiff timely filed the above-captioned action on or before 90 days from receipt of the Right to Sue that the EEOC issued. *See* Exhibit 2.

5. Plaintiff has fully complied with all administrative prerequisites for the commencement of this action.

## PARTIES

6. Plaintiff Kelly Winkler ("Kelly"), a former Vice President of Marketing, and a woman over the age of 40 living with physical disabilities, resides at 174 Canterbury Turn, Lancaster, PA 17601.

7. Plaintiff Charles Winkler ("Chuck"), a former Director of Agency Operations, is over the age of 40 living with physical disabilities, resides at 174 Canterbury Turn, Lancaster, PA 17601.

8. Defendant Synapse Print Management, LLC d/b/a Synapse Marketing Solutions ("Synapse") is a Pennsylvania limited liability company located at 2950 Old Tree Drive, Lancaster, PA 17603.

9. Defendant Saxton & Stump, LLC is a Pennsylvania limited liability company located at 280 Run Drive, Suite 300, Lancaster, PA 17601.

## FACTUAL BACKGROUND

### Synapse Employment

10. Chuck began his employment for Synapse as the Director of Agency Operations on or about May 12, 2021.

11. Chuck quickly displayed his propensity for excellent work performance and on June 23, 2021, Robert Deraco, CEO ("Bobby") exclaimed following a leadership meeting that Chuck was "a godsend."

12. Chuck proved his worth by bringing in new talent to Synapse including Tyler Moore (IT) on June 7, 2021; Jen Froderman (Content Strategist) on June 14, 2021; Gina Giambalvo (Web/Graphic Design) on June 21, 2021; Kyle Hellyer (IT Admin) on September 13, 2021; and Ben Habecker (Digital Strategist) on October 4, 2021.

13. In a leadership meeting in October 2021, Bobby credited Chuck for reforming Synapse's culture with his talent acquisitions and his role in increasing the quality of Synapse's workplace.

14. In July 2021, a position for Vice President of Business Development ("VPBD") opened at Synapse.

15. Bobby met with Chuck's wife, Kelly, to discuss the VPBD position.

16. Bobby explained that Kelly's familial relationship with Chuck posed no problem for his business and that this role would consist of building a marketing department within Synapse that would support sales.

17. Based on their conversations, Bobby offered Kelly a position as the Vice President of Marketing ("VP of Marketing"), changing the job title to reflect Kelly's core responsibilities.

18. Bobby offered Kelly – for her new role as a VP of Marketing – a $100,000 base salary with benefits and a 10% commission based on newly-acquired sales that she either facilitated or assisted in the facilitation of a new client acquisition.

19. In August 2021, Bobby asked Kelly to accompany him on a sales call at SecureStrux.

20. On route to the meeting with SecureStrux, Bobby reminded Kelly that she would receive a 10% sales commission if the sale closed.

21. In September 2021, Kelly and Chuck facilitated a meeting with a friend of theirs, Pinal Desai – owner of Information Synergies – who Kelly had previously worked with at another job.

22. This partnership would alleviate any concerns of the agency's ability to procure more website business and Bobby now had a scalable web development partner because Chuck facilitated those negotiations.

23. Bobby – excited by the prospect of working with Information Synergies – thanked Kelly and Chuck for sourcing this valuable partnership and he signed with Information Synergies later that month.

24. Both Kelly and Chuck proved themselves to be exemplary employees during their first few months of employment, and their excellent performance never wavered throughout their employment with Synapse.

25. On or around September 29, 2021, the topic of Chuck's health surfaced.

26. Shortly thereafter, in October 2021, Kelly informed Bobby that a recent MRI revealed a tumor on her right kidney and that she was undergoing surgery for it on December 9, 2021.

27. Around that same time, Bobby learned – in a meeting with Kelly and Chuck – that Chuck suffered from a heart attack in 2017.

28. On November 1, 2021, Keith Verner, Chief Operating Officer of Synapse ("Keith") held a meeting at the restaurant Tobias Frog to discuss Synapse workplace culture where all appointed and newly appointed managers were there.

29. Keith implored Chuck, Kelly, and others to openly share their experiences and specifically facilitated the conversation around Bobby's management styles and explained that this would be a safe place to discuss Bobby's workplace tendencies.

30. In response, Keith commented that: (1) Bobby often moved the goalposts, often without notifying the person working on the project; (2) communication at Synapse was a mess; and (3) Bobby was sometimes an unpleasant boss.

31. On November 24, 2021, Kelly reminded Bobby that she was set for surgery on December 9, 2021, and Bobby told Kelly that it was not a problem.

32. On November 26, 2021, Bobby emailed all staff, notifying them that Synapse would be shopping for new medical providers.

33. Bobby later informed Kelly that next year's insurance would cost the company an additional $80,000 per year and that he endeavored not to pass that expense onto employees.

34. Eight days before Kelly's scheduled surgery, Bobby began to lay the groundwork for her termination.

35. Bobby held a ten-minute meeting with Kelly's team and stated that "Kelly does not know digital marketing."

36. Bobby's statement directly contradicts her past professional experience; Kelly previously invented products for digital marketing.

37. On the day after Kelly's December 9, 2021 surgery, Bobby conducted a meeting at which he introduced AR Smith ("AR") as the new COO and elevated Sarah Hunter-Lascoskie

to VP of Operations, and Colleen Speaker ("Colleen") to Director of Operations, eliminating Chuck's position.

38. Bobby replaced Chuck with an employee 25 years younger than him.

39. On December 15, 2021, Bobby summoned Chuck into his office where Bobby and AR relayed that Chuck's position had been eliminated in favor of Colleen.

40. Further, AR approached Chuck and demanded his letter of resignation, stating that "there is no job for you anymore."

41. On December 16, 2021, after initially returning home for bed rest after her surgery, Kelly went to the emergency room because she was experiencing dizziness.

42. While at the emergency room, Jeff Alboum ("Jeff") terminated Kelly's employment with Synapse via electronic mail.

43. Jeff's email delineated that Kelly's salary benefits ended on December 15, 2021, and her healthcare benefits ended on December 31, 2021.

44. Synapse stripped Kelly of her eligibility to apply for short-term disability – while she was recovering from surgery to remove a cancerous tumor – by terminating her employment before she could apply for short-term disability.

45. Synapse never registered Kelly for short-term disability with its carrier and therefore never paid insurance premiums for her.

46. In juxtaposition to Synapse swiftly terminating Kelly while on bedrest, Synapse never provided Chuck with termination paperwork or any termination notice.

47. Synapse discriminated against Chuck and Kelly on the basis of their respective disabilities as Synapse knew that Chuck suffered from a heart condition and that Kelly had surgery to remove a potentially cancerous tumor.

48. Immediately after Kelly's disclosure of her potentially cancerous tumor, Bobby revealed that Synapse was shopping for insurance brokers and that the company was about to be burdened with an additional cost of about $80,000.

49. Synapse terminated Kelly and Chuck's employment in an attempt to obviate Synapse's increased expenses due to medical costs and to ensure that, simultaneously, the other employees would not bear the costs associated with Kelly's and Chuck's impending medical expenses.

50. As such, Synapse's clear solution was to terminate the employees that purportedly would substantially account for increasing Synapse's expenses and disrupt its bottom line.

51. Synapse's termination of Kelly while she was in the emergency room – just days after cancer surgery – evidences a causal link between Kelly's disability (cancer) and her termination.

52. Synapse could have terminated Kelly months prior, yet Synapse waited until eight days before her surgery to raise any concerns about her job performance and then terminated her days after her surgery before she had a chance to apply for short-term disability.

53. Moreover, Synapse terminated Chuck just months after disclosing past medical conditions.

54. Synapse engaged in clear age discrimination when it replaced Chuck with an employee 25 years younger than him.

55. At the time he was terminated, Chuck was 57 years old.

56. Further, Synapse's reason for terminating Chuck exemplifies its ageism as Chuck was subject to ageist comments when he was told that he did not move "quick" enough on December 15, 2021.

57. Synapse replaced Chuck because he was an older employee with a heart condition who it viewed would not be able to move quickly in the company's new direction despite the fact that he swiftly procured new talent and partnerships for Synapse.

58. Synapse violated Pennsylvania's Wage Payment and Collection Law (the WPCL) when it reneged on its promise to pay Kelly wages due and owing as the WPCL requires employers to remit payment for wages owed no later than the next regular payday.

59. Bobby promised Kelly a 10% commission of all billing from the SecureStrux account that Kelly helped to secure in August – as part of sales efforts – in perpetuity.

60. Synapse reneged on this promise and Kelly never received any compensation for contributing to the procurement of that deal for Synapse.

61. Kelly remains entitled to her commission earned and liquidated damages for Synapse's failure to timely remit payment.

62. Further, Synapse breached the duty of good faith and fair dealing when it terminated Kelly.

63. Synapse terminated Kelly, in part, to avoid paying commissions that it owed her.

64. Not only did Synapse benefit when it terminated Kelly by saving medical expenses, but Synapse was also unjustly enriched when it gained an account – that Kelly helped to procure – without paying for it.

## Saxton & Sump Employment

65. The law firm of Saxton & Sharp recruited both Kelly and Chuck following their departure from Synapse to build up its marketing department.

66. Saxton & Stump hired Kelly and Chuck for their experience and to extract their knowledge of their trade.

67. After Saxton & Stump procured this information, it fired Kelly and Chuck because of their age.

68. Instead of, in good faith, continuing their employment, Saxton & Stump chose to extract Kelly and Chuck's information and then hire younger employees to implement it.

69. In particular, Keith Verner, who was formally employed with both Synapse and currently with Saxton & Stump, knew the value that Kelly and Chuck brought and ended up replacing them after extracting their knowledge.

70. Further, Kelly and Chuck have a personal relationship with long-standing client, Pinal Desai of Information Synergies ("IS").

71. Kelly and Chuck were asked to bring IS on to work with Saxton & Stump.

72. Saxton and Stump owed IS for services rendered.

73. Saxton and Stump disputed the bill.

74. Keith Verner defamed Kelly and Chuck by stating that, "if you want to recover the money owed to you, you will need to sue Kelly and Chuck because they were negligent in using IS services.

75. Kelly and Chuck were irreparably harmed by this defamatory statement.

76. Kelly and Chuck attempted to reach out to other potential clients but Mr. Verner's statement had a negative impact on their ability to work with other clients.

77. Mr. Verner is substantially younger than both Kelly and Chuck.

**COUNT I**
**Disability Discrimination in Violation of the ADA, 42 U.S.C. § 12101, et seq. as to Kelly Winkler**
*Disability Discrimination, Hostile Work Environment, and Retaliation*
**(Against Defendant, Synapse Marketing Solutions)**

78. Kelly incorporates by reference the foregoing paragraphs as if set forth herein in their entirety.

79. Synapse was at all times an employer with more than 15 employees and subject to the ADA.

80. Kelly's disability is recognized as a disability under the ADA. Kelly suffers from cancer, which affect her ability at certain times to perform daily life activities.

81. Kelly informed Synapse's managers/supervisors of her physical disabilities, and she informed them of her need for accommodations.

82. Despite Kelly's physical disabilities, she was still able to perform the essential duties of her job with or without a reasonable accommodation.

83. Kelly requested a reasonable accommodation of time off for surgery and other medical treatment. Although this accommodation was granted by the Synapse, Synapse terminated Kelly in the midst of providing the accommodation to her.

84. Synapse retaliated against Kelly because she requested a reasonable accommodation under the ADA.

85. Synapse's actions in subjecting Kelly to discrimination based on her actual and/or perceived disabilities and/or record of impairment, and retaliating against her for requesting a reasonable accommodation for her disabilities is in violation of the ADA.

86. As a direct result of unlawful, discriminatory, and retaliatory employment practices in violation of the ADA, of which Synapse engaged in, Kelly sustained permanent and irreparable harm, resulting in her termination, which caused loss of earnings, plus the value of certain benefits, loss of future earning power, back pay, front pay, and interests.

**COUNT II**

**Disability Discrimination in Violation of the ADA, 42 U.S.C. § 12101, et seq. as to Charles Winkler**
*Disability Discrimination, Hostile Work Environment, and Retaliation*
**(Against Defendant, Synapse Marketing Solutions)**

87. Chuck incorporates by reference the foregoing paragraphs as if set forth herein in their entirety.

88. Synapse was at all times an employer with more than 15 employees and subject to the ADA.

89. Chuck's disability is recognized as a disability under the ADA. Chuck suffers from a heart condition, which affects his ability at certain times to perform daily life activities.

90. Chuck informed Synapse's managers/supervisors of his physical disabilities, and he informed them of his need for accommodations.

91. Despite Chuck's physical disabilities, he was still able to perform the essential duties of his job with or without a reasonable accommodation.

92. Synapse retaliated against Chuck because he requested a reasonable accommodation under the ADA.

93. Synapse's actions in subjecting Chuck to discrimination based on his actual and/or perceived disabilities and/or record of impairment, and retaliating against him for requesting a reasonable accommodation for his disabilities is in violation of the ADA.

94. As a direct result of unlawful, discriminatory, and retaliatory employment practices in violation of the ADA, of which Synapse engaged in, Chuck sustained permanent and irreparable harm, resulting in her termination, which caused loss of earnings, plus the value of certain benefits, loss of future earning power, back pay, front pay, and interests.

**COUNT III**
**Violations of Title VII of the Civil Rights Act of 1964 ("Title VII") as to Kelly Winkler**
*Gender Discrimination and Retaliation*

**(Against Synapse Marketing Solutions)**

95. Kelly incorporates by reference the foregoing paragraphs as if set forth herein in their entirety.

96. By committing the foregoing acts of gender discrimination and retaliation against Kelly, Synapse violated Title VII.

97. Synapse discriminated against Plaintiff on the basis of her gender when it terminated her employment, while a male colleague took over her job duties.

98. Synapse acted intentionally and willingly, with malice and/or reckless indifference to Kelly's rights, warranting the imposition of punitive damages.

99. As a direct and proximate result of Synapse's violations of Title VII, Kelly has suffered damages and losses and has incurred attorneys' fees and costs.

100. Kelly believes and therefor avers that she was discriminated against on the basis of: 1) her sex/gender; 2) stereotypes of her sex and gender; and/or 3) her complaints to Synapse.

101. Kelly is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Synapse's discriminatory and retaliatory acts unless and until the Court grants the relief requested.

**COUNT IV**
**Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. as to Kelly Winkler**
*Age Discrimination and Retaliation*
**(Against Defendant, Synapse Marketing Solutions)**

102. Kelly incorporates by reference the foregoing paragraphs as if set forth herein in their entirety.

103. Based on the foregoing, Synapse engaged in unlawful employment practices in violation of the ADEA.

104. Kelly is and was at the time of her termination, over forty years of age, and an individual within the class protected by the ADEA.

105. Synapse discriminated against Kelly on the basis of her age when it terminated her employment.

106. In discriminating against and harassing Kelly because of Kelly's age, Synapse violated the ADEA.

107. Synapse's violations were intentional and willful.

108. Liquidated damages are warranted given Synapse's willful violation of the ADEA.

109. As a direct and proximate result of Synapse's unlawful employment practices, Kelly is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Synapse's discriminatory and retaliatory acts unless and until the Court grants the relief requested.

## COUNT V
**Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. as to Charles Winkler**
*Age Discrimination and Retaliation*
**(Against Defendant, Synapse Marketing Solutions)**

110. Chuck incorporates by reference the foregoing paragraphs as if set forth herein in their entirety.

111. Based on the foregoing, Synapse engaged in unlawful employment practices in violation of the ADEA.

112. Chuck is and was at the time of his termination, over forty years of age, and an individual within the class protected by the ADEA.

113. Synapse discriminated against Chuck on the basis of his age when it terminated his employment and replaced him with two female employees who were substantially younger than him.

114. Colleen Speaker was promoted to Director of Operations.

115. Sarah Hutner-Lascoskie was promoted over Chuck to VP of Operations.

116. In addition, Alen Wolfskill, approximately 25 years old, was promoted to Web Manager.

117. In discriminating against and harassing Chuck because of Chuck's age, Synapse violated the ADEA.

118. Synapse's violations were intentional and willful.

119. Liquidated damages are warranted given Synapse's willful violation of the ADEA.

120. As a direct and proximate result of Synapse's unlawful employment practices, Chuck is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Synapse's discriminatory and retaliatory acts unless and until the Court grants the relief requested.

**COUNT VI**
**Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. as to Kelly and Charles Winkler**
*Age Discrimination and Retaliation*
**(Against Defendant, Saxton & Stump)**

121. Kelly and Chuck incorporate by reference the foregoing paragraphs as if set forth herein in their entirety.

122. Based on the foregoing, Saxton & Stump engaged in unlawful employment practices in violation of the ADEA.

123. Kelly and Chuck are and were at the time of their termination, over forty years of age, and individuals within the class protected by the ADEA.

124. Saxton & Stump discriminated against Kelly and Chuck on the basis of their age when it hire them to extract their knowledge of the marketing trade, terminated their employment, and then hired younger individuals to implement the knowledge acquired from them.

125. In discriminating against and harassing Kelly and Chuck because of Kelly and Chuck's ages, Saxton & Stump violated the ADEA.

126. Saxton & Stump's violations were intentional and willful.

127. Liquidated damages are warranted given Saxton & Stump's willful violation of the ADEA.

128. As a direct and proximate result of Saxton & Stump's unlawful employment practices, Kelly and Chuck are now suffering and will continue to suffer irreparable injury and monetary damages as a result of Saxton & Stump's discriminatory and retaliatory acts unless and until the Court grants the relief requested.

**COUNT VII**
**Violation of Pennsylvania's Wage Payment and Collection Law, 43 P.S. 260.1, et seq. as to Kelly Winkler**
*Unpaid Commissions/Wages*
**(Against Defendant, Synapse Marketing Solutions)**

129. Kelly incorporates by reference the foregoing paragraphs as if set forth herein in their entirety.

130. Synapse is an employer pursuant to the WPCL.

131. The 10% commission based on newly acquired sales Kelly facilitates or assists in facilitating the acquisition of new clients constitute wages under the WPCL.

132. The WPCL requires that employers must pay employees within 15 days of the end of the previous pay period.

133. The WPCL provides for liquidated damages for employee wages not paid without a good faith dispute.

134. Synapse failed to pay, and continues to fail to pay, Kelly for the 10% commission of all billing from the SecureStrux account from when the account was secured in August 2021 to present within 15 days of the end of each pay period.

**COUNT VIII**
**Unjust Enrichment as to Kelly Winkler**
*Unpaid Commissions/Wages*
**(Against Defendant, Synapse Marketing Solutions)**

135. Kelly incorporates by reference the foregoing paragraphs as if set forth herein in their entirety.

136. Kelly conferred a benefit on Synapse by assisting Bobby with a sales call at SecureStrux.

137. Synapse was able to secure the SecureStrux account and receive payments from SecureStrux as a result of Kelly's assistance.

138. Synapse is to pay Kelly a 10% commission for newly acquired sales she facilitates or assists in facilitating.

139. Synapse will be unjustly enriched if they are able to receive a value from SecureStrux for the income from that account, yet fail to compensate Kelly by paying her the 10% commission she is due.

**COUNT IX**
**Defamation as to Chuck and Kelly**
**(Against Saxton and Stump)**

140. Keith Verner, in the scope of his employment with Saxton and Stump, made defamatory comments regarding Chuck and Kelly being negligent.

141. This statement was published by Saxton and Stump and Keith Verner to IS and Pinal Desai.

142. This statement directly applied to Kelly and Chuck as it spoke to their performance.

143. This statement was utterly false. Kelly and Chuck never were negligent.

144. Pinal Desai and IS understood this defamatory statement to mean that Kelly and Chuck were negligent.

145. Kelly and Chuck were damaged because this statement harmed their reputation in a small business community and impaired their ability to find subsequent employment.

146. These statements were made in the scope of employment with Saxton & Stump.

147. As a direct and proximate result of Saxton & Stump's unlawful employment practices, Kelly and Chuck are now suffering and will continue to suffer irreparable injury and monetary damages as a result of Saxton & Stump's defamatory statements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks damages and legal and equitable relief in connection with Defendants' improper conduct, and specifically prays that the Court grant the following relief to Plaintiff by:

a) Declaring the acts and practices complained of herein to be in violation of the ADA, the ADEA, Title VII of the Civil Rights Act, and the WPCL;

b) Enjoining and permanently retraining the violations alleged herein;

c) Entering judgment against the Defendants and in favor of the Plaintiffs in an amount to be determined;

d) Awarding compensatory damages to make Plaintiffs whole for all lost earnings, earning capacity and benefits, past and future, which Plaintiffs have suffered or may suffer as a result of Defendants' improper conduct;

e) Awarding compensatory damages to Plaintiffs for past and future pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasure, which Plaintiffs has suffered or may suffer as a result of Defendants' improper conduct;

f) Awarding punitive damages to Plaintiffs;

g) Awarding Plaintiff such other damages as are appropriate under the ADA, the ADEA, Title VII, and the WPCL.

h) Awarding Plaintiff the costs of suit, expert fees and other disbursements, and reasonable attorney's fees; and,

i) Granting such other and further relief as this Court may deem just, proper, or equitable including other equitable and injunctive relief providing restitution for past violations and preventing future violations.

j) A jury trial on all triable issues.

Dated: March 13, 2023

*/s/ Andrew Lacy, Jr.*
Andrew Lacy, Jr. Esq.
**THE LACY EMPLOYMENT LAW FIRM LLC**
3675 Market Street
Philadelphia, PA 19104

(t) 412-301-3908
andrew.lacy@employment-labor-law.com

*Counsel for Plaintiffs*